Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eleventh Circuit is now open and according to law. God save the United States and its honorable court. Good morning and welcome to the Eleventh Circuit. Today we have four oral arguments, three cases. I think you're all familiar with our timing system, but since we don't have the luxury of having visible our lighting system, we're going to ask our courtroom sessions deputy, Ms. Geddes, to please alert you when you have two minutes left and when your time has expired. We ask that you please stick to those timing limits. Of course, if we have questions that take you over the time, we do want you to answer those questions or else we wouldn't be asking them. So within those boundaries, I just wanted to make sure everybody was aware of how we would be proceeding today. All right, we will begin with United States of America v. Pendergrass and we'll hear first from Attorney Webster. Good morning and may it please the court. My name is Leanne Webster and I represent Dontiez Pendergrass in this case. This court should vacate Mr. Pendergrass' convictions for a number of reasons. Unless the court has other questions, I plan to address two issues this morning. First, that the Google Geodata location should have been suppressed and second, that the juror number 20 should have been struck because she was barred from service. Turning to the Google Geodata location, that evidence should have been included as the fruit of the poisonous tree. The government obtained the evidence after illegally seizing and searching Mr. Pendergrass' phone. The district court found that law enforcement officers violated Mr. Pendergrass' Fourth Amendment rights by seizing the cell phone at issue and the government has not challenged that ruling on appeal. There are three exceptions to the fruit of the poisonous tree doctrine and here the district court found that the third exception applies, that the government would have inevitably discovered the evidence. That decision was an error because the government had the burden of proving that it was an active pursuit of leads that would have led to the evidence at the time of the illegal conduct. Here, the illegal conduct was the search of the phone, which happened, or the seizure of the phone, which occurred on March 10, 2017. Below, the government failed to meet its burden of showing that at the time of the search of the phone, it both, one, had in its possession leads that would have led to the evidence and two, that it was actively pursuing that evidence. Notably, Mr. Pendergrass was not a subject at the time that the phone was seized and the phone was seized in relation to a separate incident that was not related to the charges here. He was not a subject until approximately two weeks later on about March 23, 2017. The government here failed to meet its burden. First, it expressly declined to have an evidentiary hearing despite recognizing its burden to prove the facts. The government simply relied on statements in its pleadings and statements in a search warrant. This court should not give credit to those statements. First, because the statements in the pleadings are just statements by counsel and were not proven in an evidentiary hearing. And this court has held in other cases that we cannot rely on statements by counsel as evidence. Statements in the search warrant were not subject to cross-examination and therefore should also not be relied upon. The Watkins decision, which this court asked us to review prior to oral argument today, discusses the importance of evidence being presented through examination, being subject to cross-examination and possible impeachment, but none of that happened in this case. And without evidence as to the relevant facts, this court should vacate Mr. Pendergraft's conviction. Even if you give credence to the government's statements as contained in the pleadings in the search warrant, the evidence was still insufficient to meet the government's burden in this case. None of this court's prior cases countenance the finding that inevitable discovery applies when there are so many links in the chain as the government seeks or relies on here. The first link in the chain is the interview of Delbridge. And first, there's no evidence of when that interview took place, so we don't have any proof that that interview took place prior to the illegal search of the cell phone. And second, even if you assume that that interview took place shortly after the August 2016 robbery, which again is not one of the robberies that's at issue here, there was no active pursuit of that lead because the next step, which was interviewing Forrest, did not occur for 11 months. So that, you cannot say that the government was in active pursuit of the lead at that point. The next link in the chain was the interview of Forrest. That came after the search of the phone and therefore it is too late to support the government's burden under the inevitable discovery doctrine. Then the government asked this court to find that there was inevitable discovery because after the interview of Delbridge and after the interview of Forrest, then the government could have found or would have found potentially Mr. Pendergrass's Instagram account. Then it had to determine that probable cause existed for a search warrant of that Instagram account, had to then seek the search warrant, receive the return of that search warrant, identify the email address from the returns of the search warrant, determine that probable cause existed for the Google geolocation data, and then issue the search warrant for that data. This court, in all of its prior cases, has never indicated the situation in which there are so many links in the chain meets the inevitable discovery doctrine. So counsel, this is Robert Luck. We've never said that that many links to the chain is insufficient or does not support inevitable discovery, right? We've never said to the contrary. No, Your Honor. I don't think that this sort of situation has ever occurred before. And so this court has not addressed it, but in all the cases where it has addressed it, it's been more immediate, like in the Watkins decision, where Judge Luck, I know that you were on the panel of that decision, the inevitable discovery was coming later that same night. And those are the types of active pursuit. The relevant part of Watkins, though, is not necessarily the factual because these are very fact-intensive cases. But in my mind, it's the distinction that Watkins draws between the Johnson test, which is the one that you've articulated, that there has to be active pursuit of leads. In other words, the lead has to be before the illegality happened, versus the Satterfield situation, where there's some illegality with regard to a warrant and how warrant cases seem to be different. That, to me, is the relevant part of Watkins for our discussion. Is this a Satterfield case or is this a Johnson case? Because the standard seems to be different and more favorable to the government in Johnson than it is in Satterfield. Well, I think that this case also involves a search warrant, right? And so the government is saying that we would have had to get a search warrant for Instagram, and then we would have had to get a search warrant for the Google Geodata location, which they did. And so the concerns that are presented in Satterfield and the concerns that are presented in terms of the warrant are the same concerns that are presented here. So I think that the concern with the search warrant is that you don't want law enforcement officers to be able to engage in misconduct and then use the results of that misconduct in order to obtain evidence that that would eviscerate the Fourth Amendment. And here, there was the illegal search of the cell phone, and the government and the officers should have known that and should have realized that, but they were still able to use that evidence in order to... They should have known that that evidence was illegally gathered to obtain more evidence. Counsel, let's assume for the moment that I agree with you that Satterfield requires that the warrant they would have needed to get the account have already... and that was independently fine... need to have already been in the works prior to the illegality. So let's assume that I agree with you on the Fourth Amendment violation. You still have to overcome the harmless error issue, as articulated in Roy, and I'm having trouble understanding how this could be harmless given the overwhelming amount of evidence that your client was the person who committed the robberies when looked at collectively from robbery to robbery. This is Judge Anderson adding a little footnote to that. The Google data was introduced only with respect to the polo robbery, the discount robbery, and the Best Wings robbery, and with respect to polo and discount, the evidence is really overwhelming and also very strong with respect to Best Wings. So that adds to Judge Luck's question. So, again, because this is a Fourth Amendment violation, the issue is not just whether or not the evidence is harmless. The issue is whether or not it was harmless beyond a reasonable doubt. So this court has held that that means that there must be no reasonable possibility that the unconstitutionally obtained evidence contributed to the conviction. And here we have the government expressly relied on the GPS data in closing, and so it repeatedly relied on it and said he was this close to this robbery and he was this close to that robbery. As to the Best Wings robbery, I think that that data was incredibly harmful because his home or the residence where he stayed often was located close to the Best Wings location, and without the Google geodata... Now the line has expired. Thank you. All right, thank you, counsel. And we'll hear from Attorney Sanders now. May it please the court and good morning, Your Honors. Erin Sanders on behalf of the United States. Your Honors, I'm going to pick up with the Watkins case and to some of Judge Luck's points. And I want to begin first with why this case should not be in Satterfield territory. And ask that the court find, as described in the government's brief, why this is more in line with the Johnson analysis of active pursuit. And the first way that this case is distinguishable from Satterfield, Your Honors, is that this is a different kind of search. Satterfield involved the unlawful search of a house where officers unlawfully entered, they unlawfully searched, and then went, oops, we found some good stuff, let's go get a search warrant. And they got a valid search warrant. Counsel, isn't the analogy similar that the government illegally searched the cell phone, then used the information from the cell phone to bootstrap getting the warrant for the Google account, and in fact would not even have known of the Google account at least for 11 more months, if not for the illegal search of the cell phone. How is that not almost exactly like Satterfield? Well, I think there's just some, Your Honor's correct in sort of the timeline that played out here, but I think what's distinguishable about Satterfield and the kind of search that it was is that the court stressed there that the rule they were announcing was especially sound when a case involved a search warrant that was constitutionally required. Here, the search warrant just so happened to be, to use Ms. Webster's language, a link in the chain of events that led to the Google account separately from that LG phone. Yeah, but Counsel, it was constitutionally required at that time if you wanted the location data, the GPS data, to get a search warrant. That's what that means. In other words, what they're saying is unlike the situation of Johnson and specifically Watkins, those were warrant exception cases. In other words, it wasn't about needing a warrant because they fell under an exception. In Satterfield, you needed a warrant to search the house, and here you needed a warrant, the government needed a warrant, in order to search the Google data. I'm having a hard time understanding how this doesn't fall under the carve-out that Watkins acknowledged and Johnson acknowledged from the test. Let me do this, government. Assume with me that Satterfield applies. Do you agree that you have a problem, at least on the merits, and that we should then turn to harmless error? No, Your Honor, because there's other ways. If Your Honor finds that Satterfield... Well, let me back up. To answer your question, yes, Your Honor. If this court were to find that this is a direct Satterfield case, then, yes, we would have to turn to harmless error because, yes, we don't... Ms. Webster is correct. The phone was seized March 10, 2017, and at that point, you know, we hadn't begun the process of the Instagram or the Google warrant. But I would stress and, again, ask this court, you know, reconsider to the extent that it is, considering this a Satterfield case, for also a reason that was detailed in the Johnson case. You know, the Johnson case, there was no search warrant. There was no evidence that the officer in that case ever planned or thought about getting a search warrant, and the court in distinguishing Satterfield could have just stopped there, but it didn't. The Johnson court went on to note that Satterfield involved a very specific kind of and a very limited kind of investigation, the warrantless search of the house. Yeah, but, counsel, that's why Watkins is relevant because it solidifies the distinction between the Johnson line of cases and the Satterfield line of cases. I'm interested in one other issue, and that's the issue of evidence. This is very odd how this was litigated through an in limine motion with the government stating that because it's in limine, we don't need to give evidence, and then proffers. How do we make sense of all of that? How do we make sense of the fact that there truly is no evidence? It really was just a proffer from the government that the court accepted. Well, I would point to several things, Your Honor, including, as you've already noted, the way that this was raised. Yes, the government, in a footnote, in responding to the motion in limine, did note that it didn't believe a search warrant was necessary, and that was because it was, I recognize, it was citing to things in the record, but they were unobjected to and uncontested things in the record, and defense counsel had the opportunity but also never requested an evidentiary hearing. Is that the issue, that there was no objection to the factual proffer that was made simply that there was argument on the legal issue, and so the court could accept the government's proffer? Is that the way that we should look at it? Yes, Your Honor, I think so, because that's what the record shows that the district court did. There was no contrary position on any of the facts that the government asserted, and, of course, this court's reviewing the facts in the light most favorable to the government, but that's what the district court did, and so to now sort of look back and say, well, maybe there should have been, and maybe there should have been, but the district court was not erring in taking facts that nobody had contested, everybody seemed to agree on, and, yes, nobody asked for an evidentiary hearing. Can you address the Chapman standard with regard to the Beth Wings, assuming the Google data comes out, and applying the Chapman harmless error standard to the Beth Wings robbery? Yes, Your Honor, and first I want to begin because Ms. Webster made a point of recitating the Chapman standard, but as done in the brief, the analysis falls short there. Yes, the analysis in Chapman is, did the jury rely on this evidence, and if so, the error was harmful, but the piece that's missing here is, of course, unless the other evidence of guilt was so overwhelming that the defendant suffered no prejudice from the admitted evidence, so with that additional piece of analysis and turning to the Beth Wings robbery, Your Honor, and as Judge Anderson noted, we've got the three robberies with respect to the Google geolocation, and with Beth Wings specifically, Your Honor, I'd say the strongest piece of evidence that would make the Google geolocation evidence harmless is the ballistics. We've got extremely strong evidence on really all three of these robberies. They're not even contesting polos and discount grocery, and with Beth Wings, we've got ballistics, Your Honors, ballistics, tying the gun that Mr. Pendergrass fired at Beth Wings to the same .40-caliber Smith & Wesson that was used in both polos, taqueria, and discount grocery. The jury had the videos and the still shots, and the images from discount grocery, especially with Beth Wings, the way Mr. Pendergrass covered himself, his lower half of his face, and the top portion, his hair, was almost identical. There are really good still shots and images from both discount grocery and Beth Wings that the jury considered and found that those were the same robbers. Counsel, can you ask... I want to shift to a different area that wasn't brought up during your counsel's part, but she can respond during rebuttal, and that is the sufficiency of the evidence regarding the laundromat. Assume for the moment that I do not believe that Bowers, that looking at the sufficiency issue under Bowers is correct, that each robbery needs to stand on its own. How then is the coin laundry robbery sufficient without a connection to ballistics, without any GPS data or cell site location data, without a DNA, without a distinctive sweater, without any of the sorts of evidence that connects the defendant to the other robberies? Well, what we have in Bonita Coin is the... Again, the images of the videos and the still shots showing a tall, athletic build, left-handed robber yielding a black and silver pistol, the white gloves. Again, if you're just looking... If you're just looking at the Bonita Coin laundry standing by itself and not comparing it to any of the other robberies, I mean, I understand Your Honor's question, but that would be in direct contravention of the Bowers holding. Well, but Bowers requires that there be an MO, and Bowers was really strong MO evidence. I mean, the defendant there broke the door in the exact same way for every single one of nine robberies, and they all were pizza places, and there was a lot of other MO sort of evidence that I'm worried that may be missing here. Maybe you can address that. Well, and I agree with Your Honor, that is the case in Bowers, but there were also differences that the court noted. Yes, that was very strong MO evidence of how that defendant broke each door, but I would say our MO evidence is, you know, robbing around the same time of night, around closing time for these businesses, or, you know, late at night, robbing small sort of mom-and-pop shops. No, they're not all fast food restaurants like they were in Bowers, but we have consistent themes there between them, the time of the robberies, the small mom-and-pop kind of little businesses. We have a, you know, the same kind of body type.  and similar to Bowers, you know, there's one robber, there's two robbers, there's three robbers in some of these robberies, but consistent between them all was Mr. Pendergrass, the tall, athletic build, left-handed robber with a black-and-silver pistol each and every time. Is it clear that none of the other robbers and the other robberies were left-handed? Yes, Your Honor. I believe it was. And so the only robber that held the pistol in the left hand was this defendant? Yes, Your Honor. And consistently, you know, even though the evidence showed that the chrome barrel, very distinctive rifle from the Polo's Taqueria, that, you know, a rifle that the jury found was the rifle from the Polo's Taqueria robbery, you know, that's not the one that Mr. Pendergrass carried in the Polo's robbery. He consistently carried a black-and-silver pistol. And, Your Honor, and I would note, too, that also in Bonita Coin Laundry, you know, yes, this item wasn't found, but just an additional piece, there was the defendant there was wearing a red hooded shirt. I know that's not very distinctive, but, again, following Bowers and comparing it, you know, just looking at the overlapping evidence between the robberies, you know, that was consistent with a shirt worn underneath the distinctive shirt in the China Star robbery. I have a question for you. It looked to me when I was looking at the photos that a red shirt was worn under something, or as the outer garment, in every one of the robberies with a possible exception of one. And that one, the colour of the... isn't really clear. I don't know if you had any... if there was any evidence in the record to indicate what colour clothing he was wearing during that one robbery where you can't see what colour the shirt is from the stills. I'm trying to... I think it was the discount grocery robbery. Yes, Your Honor. Yes, Your Honor. That... No, there was nothing... There was no testimony specifically about what the defendant was wearing. There's just, you know, some very good up-close still shots, but I do see... You know, to Your Honor's point, yes, the colour of that video makes it a little unclear. I mean, you can tell... You can tell some things, like a dark blue shirt that he's wearing on top, but it's difficult... It's difficult to say, and there was no testimony on what colour that sort of undershirt was. Thank you. Yes, Your Honor. So, to the... Just a few minutes warning. Thank you, Ms Geddes. So, yes, I would just... I would, again, ask the court to really consider... And Judge Luck, you know, you've directed me in some ways with the Satterfield-Johnson issue, but, you know, I'm going back to that because I'm thinking of other cases in the future with investigations like this involving, you know, not really a linear time frame and certainly not a short, discreet investigation, a traffic stop, a search of a house, but, you know, complicated, multi-step investigation involving cooperators and just different things, and just ask the court to consider, you know, the impact. This could have been a case where we could have gotten the Google account from, say, Mr Delbridge or Ms Forrest at some point in the investigation would have never needed that search warrant to Instagram, that last link in the chain, getting us that Google account in a separate way. Counsel, I'm not saying the rule is a good rule or a bad rule. I'm merely trying to understand what the law is, and Watkins seemed to draw that line, and I just want to understand where this case falls on that line. That's my concern. Yes, Your Honor, and I fully appreciate that and would just, again, go to some of the language in the Watkins case making that distinction that we're dealing with a search of a house that had not been obtained until after there'd been a violation of the defendant's rights and that the requirement of a home be before the search take place. So, I mean, with that, I would ask Your Honors to please affirm the convictions of Mr Pendergrass in this case. Thank you. Thank you, Counsel. We'll hear again from Ms. Webb. Thank you, Your Honor. I just have a few points. First, as to the evidentiary issue, I want to be clear that Mr Pendergrass, through counsel, raised this issue that everyone understood that it was an ineffective suppression issue. The government recognized this in its response that Mr Pendergrass argued that the government had the burden of proof and they chose not to present any facts to meet it. So at this point, when Mr Pendergrass identified the issue and put the government on notice that it had the burden, he did not have to do anything else when the government expressly declined to fulfill its burden. I want to turn to the harmless error, the harmless beyond a reasonable doubt issue. So the first point that I would like to make on that is that at trial, through both the testimony from Agent Wynn, which we break in our brief, and in the closing argument, the government tied all these robberies together. Because you know he did one, he did all of them. And so one, I think that's improper. But two... This is Robert Luck. Is that improper under Bowers? Because Bowers seems to authorize that exact thing in its efficiency review, that once you establish MO, you can use evidence from one of identity to be able to link to the other. I think that as you indicated earlier, Bowers is distinguishable because there was no MO evidence. And certainly the jury had to analyze... I think the jury instructions are clear that you have to analyze each robbery individual and make sure there's sufficient evidence on each count. And so as you noted earlier, there was insufficient evidence to prove an MO here. There was no commonality between the types of entities. There were different robbers, different numbers of robbers. The gun that the ballistics came from was never found or connected to Mr. Pendergrass. This is Judge Anderson talking.  Was there a pistol that looked like what the robber had in his left hand in the videos? I think that the pistol that... The firearm that was found at the place where Mr. Pendergrass often stayed with his girlfriend was not the pistol that the left-handed robber was using. Those were two different firearms. The .40 caliber casing did match a pistol that looked like what the robber was holding in his left hand, did it not? My understanding of the evidence is that the ballistics confirmed that the bullets were fired or the ammo was cycled through the same firearm, but that that firearm was never itself cycled. That firearm was not identified at all? That's my understanding of the record, Your Honour. So a different pistol was found... I'm sorry. Were there any other shots fired at, for example, Discount or Polo? From a different weapon, Your Honour? Is that what you're asking? Correct. I will be honest. I don't recall that off the top of my head at this moment. I don't think so, but I am not 100% positive on that. Let me ask you a question, though. Wasn't... With respect to the ammunition and the gun that would have cycled through, even if they didn't find the gun, isn't it the case that, for example, in Polo's Taqueria robbery, where they found one of the casings that had the distinctive markings on it, that was where one of the robbers wore the distinctive white design on the black shirt, which was recovered from Mr. Pendergrass's residence and appeared to be the same shirt that was also worn in the China Star robbery, and he admitted it was his? I think that there were potentially commonalities in the clothing. I just... This court has... You know, the government has to prove this is beyond a reasonable doubt, and when we're talking about mass-produced clothing to argue that the commonalities were sufficient... Counsel, your argument has expired. You can... Thank you. You can answer the question. Thank you, counsel. You can answer it. OK. Thank you. I just think that the court should be wary of finding that there was evidence beyond a reasonable doubt when we're relying in part on mass-produced clothing and pretty generic things like a .40-caliber weapon or a left-handed robber. There are many left-handed people. There's a lot of mass-produced clothing. There are lots of people who have .40-caliber weapons. So, with that, I will conclude. Thank you. And we urge the court to vacate Mr. Pendergrass's time. Thank you very much, counsel. And I'll note that you were court-appointed, and we really appreciate your service. Thank you so much. You did a great job. All right. Thank you. It was my pleasure. Thank you.